Welcome to the Fifth Circuit Court of Appeals. We have three cases to be submitted today on oral argument, beginning with United States v. Palomares. Mr. Emmonson. Emmonson. Christian Emmonson for the United States and may it please the court. Mr. Palomares was charged in a multi-count indictment with multiple firearm-related felonies. In pertinent parts, he was charged with being a felon in possession of a firearm based on prior conviction for transporting illegal aliens within the United States. He moved to dismiss that count, arguing that the charge violated the Second Amendment. The district court granted that motion and found that there was not a historical tradition for disarming an individual like Palomares based on his predicate felony conviction. The Everman argues that that finding by the district court was incorrect for two reasons. First, the government would point to this court's decision in the United States v. Kimball. There, this court considered historical analogs for finding the catechal disarmament of people who were considered to be presumptively dangerous. They found that legislatures could make those determinations. And then it found that drug individuals convicted of drug trafficking were convicted of crimes that were intrinsically tied to or intrinsically dangerous because they were tied to violence. And therefore, they as a category could be disarmed. The government's position is that transporting aliens, smuggling offenses as criminalized in 1324 are also crimes that are intrinsically dangerous because they involve a threat to public safety and the orderly function of society. This court has already found that these alien smuggling offenses cause a risk not just to the participants who are involved, but also to law enforcement. They typically involve trying to take individuals across the border. Once they're within the country, individuals then have to be transported past immigration checkpoints where they're almost certainly guaranteed to interact with law enforcement. So there's just a heightened level of danger involved with all these crimes. Once the individuals are even brought into the country and they're harbored, they're typically held at stash houses. They can be exported for money to be released from the stash houses. These are indeed intrinsically violent felony offenses. And because Mr. Palomaro has that as a conviction, he can be disarmed consistent with this nation's historical tradition of disarming dangerous people. The government also pointed following United States BDS to laws which criminalize the slave trade, punishing individuals who engage in the slave trade with death. We argue that that is a relatively similar regulation to the smuggling offenses of today. This court is well aware, and all the courts that have grappled with Second Amendment challenges know that going into history doesn't mean that the historical sources are perfect. The Supreme Court has not required us to find historical twins for the regulations. When we're doing analogical reasoning, instead, we're simply looking for crimes that are relatively similar. Is the government recommending that we speak to both of those grounds if we end up agreeing with you? As this court sort of did in Kimball, I think one ground is sufficient. So if the court finds that alien smuggling offenses are intrinsically dangerous after Kimball, then that would be enough to stop with the analysis. It doesn't need to go any further into the predicate, into the slave trade law argument. And counsel, what do you make of the argument that we were reviewing for plain error? So the government does not believe that the review, the standard review is plain error, that the standard review should be de novo. This court has been clear that when it has applied challenges brought in district court, and the district court is asked to consider whether the, whether 922 G1 is constitutional as applied to a defendant based on his criminal history, that that then allows this court on de novo review to consider all the historical analogs for which he could be, for which he could be disarmed under. And so it's undisputed that that was the claim that was litigated below. The government argued that based on his criminal history, he could be disarmed. And now on appeal, this court can look to the entire historical record, which includes the historical analogs that were listed in Kimball, to consider whether or not he can be disarmed consistent with the Second Amendment. But you don't dispute the idea that Rule 52 or plain error review more generally applies to the government? It would, it applies to the government, but I, I take the position that once the specific claim is raised below, that this, that this court can consider the entire historical record. And that's what the court, what government's asking the court to do here. And what of the idea that Mr. Palomares could violate his crime of conviction without moving somebody across the border? So when we're doing sort of analogical reasoning under the Second Amendment, we, the court does not require sort of historical twins, and it appreciates the fact that modern regulations are tied to modern circumstances. And human smuggling today does not necessarily look like human trafficking did previously. And 1324 is specifically designed to address the realities of human smuggling today. Subsection A1A1 is targeted when people come across the border. Once you get across the border, you're not simply in the country. You then have to be transported within the country, typically through an immigration checkpoint, which is exactly what Mr. Palomares was convicted of, transporting a group of individuals through a checkpoint while they remained hidden. And then once they're in the country, they're typically harbored ahead of time, which is subsection three. So those regulations deal with the problem of alien smuggling and the distinction between not entering versus whether or not, like when you're asking the question, is the fact that they're simply traveling within, that's just the modern nature of alien smuggling in the country today. So it's responsive to that concern. But that doesn't mean that the crime is any less dangerous. In fact, because you have to take them typically aliens through the checkpoint, they're almost guaranteed to have interactions with law enforcement. And when in Kimball, this court noted that it's not just that we're talking about potential violence to the participants, we're talking about potential danger and violence to the community at large, to public safety. And in this court's case in United States v. Mendez, it observed that alien smuggling offenses endanger both the participants and law enforcement. So there is, it is an intrinsically dangerous offense. I take your point that you don't think plain error applies on the facts here. If we disagree with you, does the government lose? I think there's a case to be made that the logic of Kimball clearly extends to the circumstances here. But I would note that typically when this court has reviewed as a challenges for plain error, it has found when a predicate has not previously been litigated, and this is the first time this predicate has been litigated, that that presents an extension precedent, it projects it under prong too. So that's a yes. I would say, sure, yes. But ultimately, I don't think the court has to get there because I think this court's entire body of law on this topic is clear that the noble review applies. This court can consider new historical analogs. There were new historical analogs in Kimball, and those historical analogs prove that Mr. Palomar's can be disarmed. If the court has any questions for me, I'm otherwise content. You save time for rebuttals. Yes. You've got double duty this week. Yes, I do. I'll try to shift myself to the second amendment instead of the sixth. Thank you, Judge Smith. May it please the court. Your honors, we think, obviously, that you should affirm the district court's dismissal of count in this multi-count indictment. One thing that I think I should focus on is that we didn't hear during the government's presentation any real evidence of this perceived danger, the inherent danger, in the transporting crime that's actually at issue here. And I think, Judge Oldham, you at least touched on, hypothetically, of course, the idea that the government is relying on the nexus. In fact, they say so in their brief. They're saying, okay, the crime at the southern border of the United States is generally infused with cartel participation outside the conduct that is actually part of the events. And that, in and of itself, means that we can extrapolate that, in most cases, transporting is inherently dangerous and violent. And so I think one thing that certainly undermines that outside of the evidence that the government's proffered for the inherent link, which is nowhere near what Kimball cited, right? There was multiple opinions from, you know, Justice Kennedy's concurring opinion in Hamerlin, opinions from the first and several other circuits, opinions from this circuit, recognizing guns and drugs go together. The thing that is not present here in any close, in any similar degree, but the facts of the underlying conviction here kind of refuted itself. Remember, one of the things the government has, you know, they didn't put forward any facts in the district court below whenever we were dealing with this. But what it has done on appeal is cited to the PSR. Well, if you look at the PSR, he was given an enhancement in connection with the predicate offense for some relevant conduct, where, which was another trip where he simply transported a woman sitting in the passenger seat open, and he got stopped at the checkpoint, and they determined that she was an unlawful citizen, or a non-citizen. And so, but they didn't prosecute him for that. And he admitted to the at that time that he was possessing a firearm in the center console, and they confirmed that. But then after, even though the government made him forfeit the truck, they returned the firearm to him. And so if the simple transporting of an individual on the front seat, even at the southern border, is inherently violent, such that in any case, violence could erupt, or guns might be used in the way that it is with drug trafficking, you would think that the government would hesitate to give a firearm back to an individual who committed that crime. But that's exactly what happened. That's paragraph seven of the PSR. I'm not even sure if the court has it. I'm sure you, you have the ability to get it. But that just underscores that there isn't the same degree of ubiquitous association between voluntarily transporting somebody wholly within the United States and, and the type of cartel-infused trafficking of individuals at the actual border and over the border that the government is relying on here in order to try and shoehorn this case into Kimball. And it's, it is important to note that Kimball was a unique case, and that the, the tradition there is already an extension. Nobody is asking for a relevant, or excuse me, for a historical twin here or suggesting that we're in the trapped in amber universe. G1, by its definition, is already something where the court is having to move beyond something that is not identical in determining if there's a relevant similarity based on the comparisons between the predicate crime and things that happened at the time of the founding. We're already in the world of analogical reasoning at the point we're even at this, and that's why it makes sense that the court, especially in those four cases that I recently noted in my 20HA letter, has declined to, or has insisted on a actual relatively close link when we're looking at the Diaz-based permanent punishment tradition and why the court has been unwilling to extend Kimball in both United States versus Himbry and United States versus Doucette. This court, and of course Doucette is unpublished, but Himbry is published, this court refused to extend Kimball's reasoning to offenses that occurred at the bookends of drug trafficking. Doucette involved cultivation of marijuana, which could be for personal use, but often is at the beginning of drug trafficking, but the elements of that crime didn't require it. Himbry involved an individual's possession of methamphetamine at the back end, and yet this court said we're not going to extend Kimball because Kimball is rare, it is linked to the inherent violence that goes with the trafficking element. And the other thing that I think is very crucial for this court to pay attention to in the distinction between what was going on in Kimball and the government's argument here is that in this situation, the government is relying on intuitions about conduct that occurs outside the offense elements. The thing about Kimball is that trafficking was required, it was an element of the offense, and that element is the thing that has the inherent and ubiquitous association with guns. Can we pause right here because I'm intrigued by this part of your argument. So I understand the predicate felonies were A1A Romanette 2 and A1B Romanette 2, and the theory of the element focus sounds like what we hear from your office in crime of violence cases, right? It's like we focus on the element, we think about Taylor and the categorical approach, and then I think you have a well-taken point, which is like, hey, it's possible to violate this provision, in particular, let's put B to the side for a second, A1A Romanette 2. You're quite right. You can do that without bringing somebody into the country, and we'll just say for the sake of discussion, who knows what the facts of the underlying crime were, you could imagine that being committed in a way that wasn't as violent as cartel behavior at the border. So let's just stipulate all that for discussion. It does have this flavor of the categorical approach. Am I understanding? I would, first of all, Judge Oldham, I would love for the categorical approach to apply here. I bet you would. I wouldn't have to say any more words. Just by the fact that I could have come up here and told you that the crime can be committed in the way that that relevant conduct that was going on in our prior offense, I'd be done, you know? And so we certainly, I mean, in fact, we did make that argument at the beginning once all of this, pardon me, once all of this started in the run-up to Diaz, but that quickly, it became clear with Bullock in subsequent cases that the court is not going to insist on that level of tightness, I guess, between the elements and the offense, and we're not looking for the least culpable conduct. Nobody's suggesting that the least culpable conduct is what this court should look at. What the Diaz, or excuse me, what the Kimball tradition is looking at is something that even though violence doesn't occur, it doesn't have to occur, and even though a firearm doesn't have to be present, the type of behavior by its nature, it's almost closer to the residual clause, which you, by luck, missed out on most of because it was invalidated right around the time you got onto the court, but your other two panel members would have dealt with for decades. And so it does resemble that, and I'm not suggesting anything negative about the approach simply because it's similar to that. All I'm saying is we're relying on the nature of the conduct, but at least we, just as with the residual clause, we at least looked at the ordinary case or the usual case of the conduct covered by the elements, and the conduct covered by these elements is simply transporting. It is not, in fact, in no case does the government ever have to prove that an individual who transports was connected to the transportee's unlawful entry in any way. It doesn't have to be the case, and in fact, one of the oversights that we pointed to in the briefing from the government is that unlike bringing in, which is always going to involve somebody who is in that, making a surreptitious entry, transportation can involve somebody who didn't even enter unlawfully. Somebody who was here on a student visa, on a work visa, who maybe had been granted asylum, maybe they were on an LPR, but then they came back and were on parole or whatever reason. All of a sudden, they are no longer authorized to be here, but they remain, and then they ask somebody to transport them from one place to another. You can imagine that absolutely. People recently would have tried to get out of Minnesota or Chicago or places where the government was ramping up enforcement of immigration laws, and so maybe, hey, will you help me go to my cousin's house somewhere else in the United States that isn't such a focus at the moment, and that is the type of conduct that there is nothing about this statute that limits it to the type of inherent cartel-infused violence that the government is talking about does happen in some cases, and I will even spot them that it happens frequently in the southern border, but of course, the Second Amendment applies to the whole country. 1324 applies to offenses that take place across the country. There's no evidence that the cartel runs the smuggling or like the bringing in operation at our Canadian border or that all of those offenses are necessarily associated with violence. There's no evidence that individuals who come in through other ports of entry, like on ships or on airplanes, that those individuals are connected with the cartel. So I take the tenor of the argument, and it's consistent with what jumped out of me in the brief, which is footnote one. Footnote one in the red brief, you suggest, well, there's no evidence that the government puts forward about how this A1A Romina II violation was committed, so is the idea that the better regime would be one that's sort of opposite of Taylor, which is that when the government is using a predicate offense in this way, we need to have a little evidentiary hearing before sentencing, or the district court needs to hear from witnesses or consult. I don't mean to too heavily borrow on the categorical approach, but I mean, you know, we look at the Shepard documents, and what exactly is it you think the government has to do to show that this A1A Romina I offense, I'm sorry, Romina II offense was subject to felon disorder? Well, in order to answer that, I think it's best to go back to the front of what Bruin and what now Rahimi, as amended by Rahimi, Brahimi, if you will, requires, right? And so we're looking at, has the government identified a historical tradition that is consistent with the way this particular modern law is applying? When we're in the G1 context, obviously I have to stick with this court's cases, and Diaz and Kimball and the other decisions that have been in this space have recognized that what we're doing is we can't find an exact fit for G1, so we're going to look at the predicates and how they relate to other punishments that happened at the time of the founding. And so once the government identifies the tradition, it's that particular tradition that you look at. So in Mitchell, for instance, we're dealing with a G3 predicate, G3 being possession of a firearm by an unlawful habitual user of drugs, right? And so the difference between Mitchell's result, which is G1 unconstitutional, and Contreras' result, G1 not unconstitutional, when that same predicate is at issue, is the court looked to the facts because the relevant tradition there was intoxication. And so the court said, if you're intoxicated at the time you possess the weapon, that falls within the tradition. But if you aren't, if there's not evidence that you were, it doesn't. So that's one instance where the court does look to the facts. The court looked to the facts in Diaz. It's also looked to the facts in Bullock. But then I don't think that it's appropriate necessarily when you're talking about the Kimball tradition. The Kimball tradition is different. It is talking about, and in fact, there's already been several opinions, Mencia and Judge Graves, I think, in several dissenting opinions has recognized that Kimball said we don't look to the facts in order to determine if it's within the inherent danger. What we do is we look at the conduct as a whole to decide if it fits into this special inherently dangerous. Because again, remember that in the Kimball, what we're actually doing is looking at their tradition of disarming categories of people based on like political dissidents and religious dissidents because of the assumption or the judgment that they are very likely to present a risk of violence if they're able to possess firearms. And so when you're relying on an inherent danger that isn't just obvious or present or hasn't been adjudicated before, for instance, with an actual violent crime on the resume, then I think that it is a focus on the actual character of the crime in order to determine that. So in most instances under the way I understand this Court's Second Amendment jurisprudence so far, you will be looking at, able to look at the facts to see if the conduct that's encompassed within the elements, at least, because we are not looking at relevant conduct or uncharged conduct. That's something Kimball made clear as well too. But whether that conduct that is part of the crime did take place in a violent way. I think the Betton Court is a good example of that where the underlying facts were that it was an aggravated assault case and I argued that because it could be committed recklessly and in fact in that very case the defendant had burned a red light going 107 miles an hour and caused injury to people, right? And so the Court looked at those facts and said that involves the type of special, like the type of conduct, risky conduct that endangers people that presents the special danger of misuse of a firearm based on the actually dangerous tradition. You've engaged in conduct that was actually dangerous, that actually suggests you might hurt people again in the future and therefore would be, can't be trusted in Kimball's words with a firearm. That's just not present here in our view in the transporting context and I think that as I pointed out, that relevant conduct incident in my own client's past demonstrates that he was given a gun that he lawfully possessed during that offense back to him. And so that really undermines the idea that inherent in that conduct is something that is intrinsically violent in each case and again we're not relying on a categorical approach but we're relying on an ambient level of likelihood of the misuse of a firearm in the conduct that's involved in the offense and transporting just has a wide swath of conduct that just isn't, it's almost like you could say an over breadth type of situation and we're not certainly not suggesting that you know it's over broad in the First Amendment context but it is what we're doing is we're showing that that's not an issue in the case. And so for instance, I don't think you could look at necessarily Mr. Palomaris' prior conviction and say that well because he got into a fist fight with one of the, this is not actually true, this is hypothetical, but like let's say he got into a fist fight with one of the non-citizens he was transporting and then got a bump on his guidelines range for that. That would be relevant conduct to the offense that involved dangerous conduct and involved violence but I don't think that this court's inquiry allows it to look at that. I think Cochram just made that clear and Himbury certainly made that clear in this very context because remember Himbury, the government argued there that hey we've got some evidence that even though he was only convicted of possessing methamphetamine he probably was actually distributing it a little too and this court in Himbury said that's not good enough. We are restricted to the crime of conviction and so if the crime of conviction doesn't involve the inherent danger then we're not going to allow on that crime's nexus, to use a phrase from the government's brief here, to the actual inherently dangerous conduct which is the drug trafficking. I will briefly I guess touch on the preservation issue. We obviously made that argument in the brief. We stand by the fact that the court has insisted that the government is stuck with plain error in instances where it's forfeited arguments even where it did litigate a constitutional issue. I think the Kelly case that I cited is a good example. The district court suppressed evidence based on you know a search of a car and the government had argued oh inventory exception below but then on appeal it said never mind inventory exception we had probable cause. Of course it's allowed to do that but because it was appellant the court said you're on plain error for that and I think they ended up winning on plain error and I think Mr. Amundson correctly conceded that under this court's version of second prong he would fail in that instance. What do you do with the cases where we've this exact context so I take your point generally about plain error but haven't isn't it rule of thumbs arguments on historical analogs? I mean we've done that before. I recognize those cases. I tried to distinguish them in the brief obviously. I can't really give you anything more than that than I've offered there. I think that you know I tried to note that in the in I believe it was Bullock the defendant there had relied mostly on party presentation as opposed to forfeiture and that there is some difference there but I acknowledge that the court is allowed and look I understand that this panel is not likely to hold a federal statute unconstitutional just simply by saying at least as applied simply because the government failed to make the right argument right and so that's why I noted the point about preservation that's up to this court to decide what its standard of review is but at the bottom line I don't think there was any error plain or otherwise here because this crime is not even close to the participation in transatlantic slave trade in terms of its its culpability and harm that it visits on individuals and we don't think that it's wise to extend Kimball to this context based on the mere nexus to dangerous conduct that isn't even within the elements of the offense and that you can we would urge the court to write narrowly of course in in our favor and so you can leave for another day whether the offense of harboring or bringing in yeah would require a different result for these reasons we ask you to affirm all right thank you Mr. Emmonson for rebuttal just very briefly I would point out that you know these transporting offenses are designed permission they're considered and labeled as alien smuggling because smuggling is a transportation offense which involves trying to avoid law enforcement or legal interdiction so it's not simply the case that we're talking about offenses where defendants are driving someone from a to b the purpose you're driving them from a to b is to avoid law enforcement and there's a likely good of an encounter with law enforcement and that is sort of where the danger arises so I think Kimball is clear you don't necessarily have to look at that you don't look at the facts of the underlying case we can speak broadly because there's a presumption of danger and it's not that the defendant necessarily had a violent past but there's a risk in the activity that he's engaged with that it would be danger and violence and that these offenses clearly need that sort of definition thank you your case is under submission